UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'09 CIV 1826**

---------------------------------------------------- x

SAFRON CAPITAL CORPORATION,
Individually and On Behalf of All Others
Similarly Situated,

                Plaintiff,

    vs.

CHESAPEAKE ENERGY CORPORATION,
AUBREY K. MCCLENDON, MARCUS C.
ROWLAND, MICHAEL A. JOHNSON,
RICHARD K. DAVIDSON, FRANK A.
KEATING, BREENE M. KERR, CHARLES
T. MAXWELL, MERRILL A. MILLER, JR.,
DONALD L. NICKLES, FREDERICK B.
WHITTEMORE, UBS INVESTMENT
BANK, ABN AMRO, BANC OF AMERICA
SECURITIES LLC and WELLS FARGO
SECURITIES,

                Defendants.

---------------------------------------------------- x

: Civil Action No.

: CLASS ACTION

: COMPLAINT FOR VIOLATION OF THE
  FEDERAL SECURITIES LAWS

: DEMAND FOR JURY TRIAL



RECEIVED

FEB 2 ? 2009

U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THIS ACTION

1.      This is a securities class action against Chesapeake Energy Corporation ("Chesapeake" or the "Company"), its directors and its investment bankers (collectively, the "Defendants") for violations of the Securities Act of 1933 (the "Securities Act"). Plaintiff brings this action on behalf of itself and all other purchasers of Chesapeake stock issued pursuant to the registration statement and prospectus (collectively, the "Registration Statement") filed with the Securities and Exchange Commission ("SEC") and issued by Chesapeake in connection with Chesapeake's July 2008 secondary public stock offering (the "Offering"). This action involves solely strict liability and negligence claims.

2.      Defendant Chesapeake is the third largest independent producer of natural gas in the United States. Chesapeake's strategy is focused on discovering, acquiring and developing conventional and unconventional natural gas reserves onshore in the U.S., east of the Rocky Mountains.

3.      On July 15, 2008, Chesapeake completed a secondary public offering of 28.75 million shares of common stock at $57.25 per share (including the underwriters' 3.75 overallotment), receiving approximately $1.65 billion in gross proceeds, with net proceeds of $1.586 billion (after underwriting and other costs). The Registration Statement failed to disclose numerous facts which were required to be stated therein, including:

(a)      that the Company's exposure to natural gas price declines had not been adequately limited by the hedging actions the Company had undertaken prior to the Offering, including its decision to increase its hedge position from 20% to 80% of its production, as a growing proportion of the hedging agreements on Chesapeake's 2009 production contained so-called "knockout" provisions that eliminated the counter-party's financial obligation once the price of natural gas fell below a certain benchmark;

(b)     Though the Company disclosed it had entered into hedging contracts to protect its production from falling prices, the Registration Statement failed to disclose that a significant proportion of these contracts had been made with one of the underwriters in the Offering, Lehman Brothers, though based on Lehman Brothers' rapidly declining financial condition, Lehman Brothers would be unable to fulfill its financial commitment – rendering Chesapeake's "protection" meaningless;

(c)     In the months leading up to the Offering, Chesapeake's aggressive hedging activities (and those of certain of the underwriter defendants) had been significantly running up the price of natural gas, and Chesapeake's stock price, which moves in tandem with natural gas prices;

(d)     that Chesapeake's "land men," *i.e.*, lease brokers, had been aggressively bidding up the prices Chesapeake was obligated to pay in leases and royalty agreements in the months leading up to the Offering, causing Chesapeake to pay unreasonably high prices for certain leases and royalty contracts;

(e)     that the Company was failing to write down impaired goodwill on the assets it was acquiring, causing its balance sheet and financial results to be artificially inflated; and

(f)     that the Company's internal controls were inadequate to prevent the Company from improperly reporting its goodwill.

4.     Plaintiff and the other members of the Class (defined below) have suffered hundreds of millions of dollars in damages as a result of their purchases of Chesapeake shares. As the truth about Chesapeake and its operations reached the market during late 2008 and early 2009, the price of Chesapeake stock declined to less than $12 per share, approximately 80% below the Offering price.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

7.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22 of the Securities Act. Acts and transactions giving rise to the violations of law complained of herein occurred in this District. The violations of law complained of herein occurred in substantial part in this District, including the preparation and dissemination of materially false and misleading statements and the omission of material information complained of herein. The Underwriter Defendants all maintain their principal places of business in this District. In connection with the conduct complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone communications, and the facilities of the New York Stock Exchange.

## THE PARTIES

8.     Plaintiff Safron Capital Corporation purchased Chesapeake common stock, as described in the attached certification incorporated by reference herein, and was damaged thereby.

9.     Defendant Chesapeake is the third largest independent producer of natural gas in the United States. It owns interests in approximately 38,500 producing oil and natural gas wells that are currently producing approximately 2.2 billion cubic feet equivalent, or bcfe, per day, 92% of which is natural gas. Chesapeake's strategy is focused on discovering, acquiring and developing conventional and unconventional natural gas reserves onshore in the U.S., east of the Rocky Mountains. The Company's principal executive offices are located at 6100 North Western Avenue, Oklahoma City, Oklahoma. Chesapeake completed its initial public offering in early 1993 and its 600+ million shares trade under the symbol CHK on the New York Stock Exchange.

10.     Defendant Aubrey K. McClendon ("McClendon") has served as Chairman of the Board, Chief Executive Officer and a director since co-founding the Company in 1989. McClendon signed the Registration Statement.

11.     Defendant Marcus C. Rowland ("Rowland") joined Chesapeake in 1992, prior to the Company's 1993 IPO, and serves as its Executive Vice President of Finance and Chief Financial Officer. Rowland signed the Registration Statement.

12.     Defendant Michael A. Johnson ("Johnson") has served as Chesapeake's Senior Vice President—Accounting, Controller and Chief Accounting Officer since 2000. He previously served as the Company's Vice President of Accounting and Financial Reporting from 1998 to 2000 and as Assistant Controller from 1993 to 1998. Johnson signed the Registration Statement.

13.     Defendant Richard K. Davidson ("Davidson") has been a member of Chesapeake's Board of Directors since March 2006. Davidson signed the Registration Statement.

14.     Defendant Frank A. Keating ("Keating") has been a member of Chesapeake's Board of Directors since 2003. Keating signed the Registration Statement.

15.     Defendant Breene M. Kerr ("Kerr") has been a member of Chesapeake's Board of Directors since 1993. Kerr signed the Registration Statement.

16.     Defendant Charles T. Maxwell ("Maxwell") has been a member of Chesapeake's Board of Directors since 2002. Maxwell signed the Registration Statement.

17.     Defendant Merrill A. Miller, Jr. ("Miller") has been a member of Chesapeake's Board of Directors since 2007. Miller signed the Registration Statement.

18.     Defendant Donald L. Nickles ("Nickles") has been a member of Chesapeake's Board of Directors since 2005. Nickles signed the Registration Statement.

- 4 -

19.    Defendant Frederick B. Whittemore ("Whittemore") has been a member of Chesapeake's Board of Directors since 1993. Whittemore signed the Registration Statement.

20.    The defendants referenced above in ¶¶10-19 are referred to herein as the "Individual Defendants."

21.    Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America. Headquartered in New York City, Banc of America offers trading and brokerage services; debt and securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts, and mergers and acquisitions. Banc of America acted as underwriter for the Chesapeake Offering, serving as a Joint Book-Running Manager and helping to draft and disseminate the Offering documents.

22.    Defendant UBS Investment Bank ("UBS") is the U.S. operating subsidiary of UBS AG, a diversified global financial services company. Headquartered in New York City, UBS offers wealth management, investment banking, asset management and business banking services. UBS acted as underwriter for the Chesapeake Offering, serving as a Joint Book-Running Manager and helping to draft and disseminate the Offering documents.

23.    Defendant ABN AMRO ("ABN AMRO") is a bank holding company which performs commercial banking operations, investment banking and other related financial activities through its subsidiaries. Headquartered in the Netherlands, ABN AMRO is managed by a consortium of Fortis, RBS and Santander ("RFS Holdings"). The Dutch state has acquired Fortis' interests in ABN AMRO and continues managing ABN AMRO through RFS Holdings. ABN AMRO acted as an underwriter for the Chesapeake Offering, serving a Joint Book-Running Manager and helping to draft and disseminate the Offering documents.

24.     Defendant Wells Fargo Securities ("Wells Fargo") is the investment banking arm of Wells Fargo & Company. Headquartered in San Francisco, Wells Fargo raises public and private debt and equity as well as providing strategic advisory services in the areas of M&A, the debt, equity and private capital markets and retail syndications. Wells Fargo acted as the underwriter for the Chesapeake Offering, serving as a Joint Book-Running Manager and helping to draft and disseminate the Offering documents.

25.     The defendants referenced above in ¶¶21-24 are referred to herein as "Underwriter Defendants." They served as the underwriters of the Offering and received fees of more than $51 million collectively. The Underwriter Defendants determined that in return for their share of the Offering proceeds, they were willing to merchandise Chesapeake stock in the Offering. The Underwriter Defendants arranged multi-city roadshows prior to the Offering during which they, and certain of the Individual Defendants, including defendants McClendon and Rowland, met with potential investors and presented highly favorable information about the Company.

26.     The Underwriter Defendants also demanded and obtained an agreement from Chesapeake that Chesapeake would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Chesapeake had purchased millions of dollars in directors' and officers' liability insurance.

27.     Representatives of the Underwriter Defendants also assisted Chesapeake and the Individual Defendants in planning the Offering, and purportedly conducted an adequate and reasonable investigation into the business and operations of Chesapeake, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the Offering. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning

Chesapeake's business, financial condition, internal control and its future business plans and prospects, as demonstrated by the $1.1 billion VPP contract UBS AG (along with Deutsche Bank AG) entered into with Chesapeake in January 2008, as described herein and Chesapeake's VPP contract with ABN AMRO. Lehman Bros., which is now bankrupt, was a co-venturer with Chesapeake in a business that provided 15% of the Company's 2008 revenues.

28.   In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Chesapeake's management and top executives and engaged in "drafting sessions" between May and July 2008. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which Chesapeake stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Chesapeake would be made in the Registration Statements (including the financial statements incorporated therein by reference); and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Chesapeake's management and top executives, the Underwriter Defendants knew, or should have known, of Chesapeake's existing problems as detailed herein.

29.   The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class. The Underwriter Defendants are liable for the false and misleading statements in the Registration Statement. The Underwriter Defendants drafted and disseminated the Offering documents and were paid fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## CHESAPEAKE'S UNDISCLOSED LEHMAN BROS. EXPOSURE

30.     Though the Registration Statement disclosed that Lehman Bros. provided investment banking and advisory services to Chesapeake, was a party to Chesapeake's revolving bank credit facility, that an affiliate of Lehman Bros was a participant in a drilling business with Chesapeake and that another affiliate of Lehman Bros. was the owner of an entity to which the Company made sales to representing 15% of its total revenue in 2007, the Registration Statement did not disclose that Lehman Bros. was the counterparty to a portion of the contracts hedging Chesapeake's oil and natural gas production. By at least July 2008, Lehman Bros.'s deteriorating financial condition had significantly diminished the likelihood that Lehman Bros. would be able to pay Chesapeake for the output under the hedging contracts at the agreed-upon prices.

31.     Specifically, in August 2007, Lehman Bros. closed its subprime lender, BNC Mortgage, eliminating 1,200 positions in 23 locations, and took a $25-million after-tax charge and a $27-million reduction in goodwill. Lehman Bros. conceded that poor market conditions in the mortgage space "necessitated a substantial reduction in its resources and capacity in the subprime space." Nonetheless, throughout 2008, Lehman Bros. would face unprecedented losses due to the continuing subprime mortgage crisis. Lehman Bros.'s losses resulted from its continuing to hold large positions in subprime and other lower-rated mortgage tranches when securitizing the underlying mortgages. Huge losses accrued in lower-rated mortgage-backed securities throughout 2008. In the second fiscal quarter alone, Lehman Bros. reported losses of $2.8 billion and was forced to sell off $6 billion in assets. Meanwhile, during the first half of 2008, Lehman Bros.'s stock lost 73% of its value as the credit market continued to tighten. Lehman Bros. finally filed for Chapter 11 bankruptcy protection on September 15, 2008.

**THE OFFERING**

32.     On or about May 17, 2008, Chesapeake filed with the SEC a Form S-3ASR

Registration Statement and Prospectus using a "shelf" registration or continuous offering process.

Under the shelf, Chesapeake would be permitted to sell securities described in the Prospectus in one

or more offerings, including an indeterminate number of shares of common stock. The Prospectus

was a part of the Registration Statement.  The securities were to be issued by Chesapeake.

33.     The Form S-3ASR incorporated by reference subsequently filed prospectuses:

[F]or the purpose of determining any liability under the Securities Act of 1933, each
such post-effective amendment shall be deemed to be a new registration statement
relating to the securities offered therein, and the offering of such securities at that
time shall be deemed to be the initial bona fide offering thereof

34.     The Form S-3ASR also included assurances that the registrant would:

reflect in the prospectus any facts or events arising after the effective date of the
registration statement (or the most recent post-effective amendment thereof) which,
individually or in the aggregate, represent a fundamental change in the information
set forth in the registration statement.

35.     On July 8, 2008, Chesapeake announced it would conduct a common stock offering

of 25 million shares. The release also stated that Lehman Bros. and UBS would act as joint book-

running managers for the offering.

36.     On July 9, 2008, Chesapeake announced the pricing of its common stock offering in a

release which stated in part:

Chesapeake Energy Corporation today announced that it has priced a public
offering of 25 million shares of its common stock at $57.25 per share. The company
has also granted the underwriters a 30-day option to purchase a maximum of 3.75
million additional shares of its common stock. Chesapeake expects the issuance and
delivery of the shares to occur on July 15, 2008, subject to customary closing
conditions.

37.     On or about July 9, 2008, the Company filed its Prospectus for the Offering, which

was declared effective by the SEC and forms part of the Registration Statement.  The Prospectus

incorporated by reference Chesapeake's Form 10-K for the year ending December 31, 2007 and its Form 10-Q for the three months ending March 31, 2008. The Prospectus further incorporated by reference the Company's Form 14A filed on April 29, 2008, certain of the Company's Form 8-Ks filed with the SEC, including the Company's 8-K's filed on January 4, 2008, January 24, 2008, March 20, 2008, March 26, 2008, April 1, 2008, April 16, 2008, April 18, 2008, May 12, 2008, May 23, 2008, May 27, 2008, May 29, 2008, June 4, 2008, June 11, 2008, June 12, 2008, July 8, 2008, and July 9, 2008 (excluding any information furnished pursuant to Item 2.02 or Item 7.01 of any such Current Report on Form 8-K); and Chesapeake's registration statement on Form 8-B (File No. 001-13726) filed on December 12, 1996, as amended by its Current Report on Form 8-K filed on March 26, 2008.

38.     The Registration Statement was negligently prepared and as a result contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations governing its preparation.

39.     In addition to the undisclosed Lehman Bros. exposure, the Registration Statement omitted important information about the dramatic impact Chesapeake's and certain of the underwriters' hedging activities were having on natural gas prices. The significant increases in natural gas prices the hedging activities were causing were material as Chesapeake's stock price moves in tandem with natural gas prices. As such, the higher Chesapeake's and the underwriters' hedging activities drove up natural gas prices, the higher they drove up Chesapeake's stock price in the weeks leading up to the Offering:



01/30/2009 C=4.417 -.101 O=4.465 H=4.660 L=4.395 Mov Avg 3 lines

Created with SuperCharts by Omega Research © 1997

40.    By Thursday July 3rd, natural gas futures had reached an all-time high of $13.49 per 1,000 cubic feet. As the chart indicates, natural gas prices began plummeting upon the resumption of trading on July 7th as governments warned that global credit problems would significantly reduce global oil demand – and prices. Natural gas is a less desirable substitute for oil, and so its price declines more rapidly than declines in the price of oil.

41.    The Registration Statement also failed to disclose the dramatic impact that Chesapeake's band of 4,000 "land men" were having on the price of leasing natural gas development rights in Chesapeake's prime areas of development. Due in large part to Chesapeake's and the Underwriter Defendants' hedging activities, between May and June 2008, untapped natural gas deposits suddenly became viable – and valuable – due to soaring natural gas prices and

improvements in drilling capacity. In one area of West Virginia, lease rates spiraled from $5-an-acre plus 12.5% royalties to $350-an-acre plus 15% royalties. The same thing happened in Broome and Delaware Counties in New York. Per-acre offers started out at $25-$50. Before long some landowners had negotiated lease prices as high as $2,411-an-acre plus a 15% royalty. As a result of Chesapeake's land men's aggressive bidding practices, the lease and royalty contracts Chesapeake was entering into bore no rational relation to the value to be realized from selling the natural gas underlying contracts.

42.    As a result, the Registration Statement used by Defendants in connection with the Offering negligently failed to disclose that:

(a)    Though the Company disclosed it had entered into hedging contracts to protect its production from falling prices, the Registration Statement failed to disclose that a significant proportion of these contracts had been made with Lehman Bros., though based on Lehman Brothers' rapidly declining financial condition, Lehman Brothers would be unable to fulfill its financial commitment – rendering Chesapeake's "protection" meaningless;

(b)    In the months leading up to the Offering, Chesapeake's aggressive hedging activities (and those of certain of the Underwriter Defendants) had been significantly running up the price of natural gas, and Chesapeake's stock price which moves in tandem with natural gas prices;

(c)    Chesapeake's "land men," *i.e.*, lease brokers, had been aggressively bidding up the prices Chesapeake was obligated to pay in leases and royalty agreements in the months leading up to the Offering, causing Chesapeake to pay unreasonably high prices for certain leases and royalty contracts;

(d)    The Company was failing to write down impaired goodwill on the assets it was acquiring, causing its balance sheet and financial results to be artificially inflated;

(e) The Company's internal controls were inadequate to prevent the Company from improperly reporting its goodwill; and

(f) The Company's exposure to natural gas price declines had not been adequately limited by the hedging actions the Company had undertaken prior to the Offering, including its decision to increase its hedge position from 20% to 80% of its production, as a growing proportion of the hedging agreements on Chesapeake's 2009 production contained so-called "knockout" provisions that eliminated the counter-party's financial obligation once the price of natural gas fell below a certain benchmark.

43. Plaintiff and the other members of the Class have suffered hundreds of millions of dollars in damages as a result of their purchases of Chesapeake shares. During late 2008 and early 2009, as the omitted facts were revealed to the market, the price of Chesapeake stock declined to less than $12 per share, approximately 80% below the Offering price:

(a) On October 10, 2008, Chesapeake issued a press release filed with the SEC on a Form 8-K Current Report disclosing for the first time that in addition to serving as an underwriter in the Offering, providing other investment baking and advisory services to Chesapeake, providing part of Chesapeake's revolving bank credit facility, and being a customer and significant business partner to Chesapeake, Lehman Bros. – which finally filed bankruptcy two months after the Offering – was a counter-party to a portion of the hedges Chesapeake had on its natural gas and oil production. Chesapeake claimed in the Registration Statement these hedges protected it from price decreases, but due to Lehman Bros. already significantly deteriorated financial condition at the time of the Offering, the hedge contracts represented a commitment Lehman Bros. could not keep. In its October 10th Update, Chesapeake estimated that with respect to the terminated derivative contracts, the amount by which the net value of the financial natural gas and oil hedges Chesapeake had with

Lehman Bros. exceeded the amount anticipated to be received by the Company from selling or rehedging the gas could reach $50 million; and

       (b)    Thereafter, on January 27, 2009 Chesapeake announced its financial and operational results for the 2008 fourth quarter and full year, disclosing that the Company would take a non-cash impairment charge of approximately $1.8 billion. According to Defendant Rowland's comments during a February 18, 2009 conference call, the impairment broke down into five categories: (i) Chesapeake's "full cost pool" (defined in its 2007 10-K as "all costs associated with property acquisition, exploration, and development activities for a company using the full-cost method of accounting," but not "costs related to production, general corporate overhead or similar activities"); (ii) a gas processing plant in Southern Oklahoma; (iii) a refining operation in Western Oklahoma; (iv) rig investments, including the 50/50 joint venture Chesapeake had with Lehman Bros.; and (v) "other investments."

## CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and (b)(3), on behalf of a class consisting of all persons who purchased Chesapeake common stock in the Offering (the "Class"). Excluded from the Class are the Defendants named herein, the officers and directors of Chesapeake, members of the immediate families of such officers and directors, and subsidiaries and affiliates of Defendants and their officers and directors. Class members are so numerous that joinder of them is impracticable. Common questions of law and fact predominate and include: (i) whether Defendants violated the Securities Act; (ii) whether the Registration Statement failed to disclose material facts required to be disclosed therein; and (iii) the extent of and appropriate measure of damages.

45.     Plaintiff's claims are typical of all Class members' claims.  Plaintiff has selected counsel experienced in class and securities litigation and will fairly and adequately protect the interests of the Class.  Plaintiff has no interests antagonistic to those of the Class.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class individually to seek redress for the wrongful conduct alleged.

47.     Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

### COUNT I

**Violation of §11 of the Securities Act**
**Against All Defendants**

48.     Plaintiff repeats and realleges each and every allegation contained above.

49.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

50.     This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Plaintiff does not allege that these defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

51.     The Registration Statement for the Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

52.     Chesapeake is the registrant for the Offering.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

- 15 -

53.     As issuer of the shares, Chesapeake, is strictly liable to Plaintiff and the Class for the misstatements and omissions.

54.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

55.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

56.     Plaintiff acquired Chesapeake shares of common stock pursuant and/or traceable to the Registration Statement for the Offering.

57.     Plaintiff and the Class have sustained damages.  The value of Chesapeake shares of common stock has declined substantially subsequent to and due to defendants' violations.

### COUNT II

#### Violation of §12(a)(2) of the Securities Act
#### Against All Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above.

59.     This Count is brought pursuant to §12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

60.     This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Plaintiff does not allege that the defendants named in this Count or the other defendants had scienter or fraudulent intent, which are not elements of a §12 claim.

61.     The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed plaintiff and the other members of the Class who purchased Chesapeake shares of common stock pursuant to the Prospectus the duty to

make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

62.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time plaintiff acquired the Company's shares.

63.     By reason of the conduct alleged herein, defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Chesapeake common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of Chesapeake common stock. Accordingly, plaintiff and the other members of the Class who hold such common stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued herein. Class members who have sold their shares of common stock seek damages to the extent permitted by law.

### COUNT III

### Violation of §15 of the Securities Act
### Against the Individual Defendants

64.     Plaintiff repeats and realleges each and every allegation contained above.

65.     This Count is brought pursuant to §15 of the Securities Act against the Individual Defendants.

66.     The Individual Defendants each were control persons of Chesapeake by virtue of their positions as directors and/or senior officers of Chesapeake. The Individual Defendants each had a

series of direct and/or indirect business and/or personal relationships with other directors and/or

officers and/or major shareholders of Chesapeake.

67.    The Individual Defendants each were culpable participants in the violations of §11 of

the Securities Act alleged in the Count above, based on their having signed or authorized the signing

of the Registration Statement and having otherwise participated in the process which allowed the

Offering to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages, including interest;

C.    Awarding plaintiff's reasonable costs and attorneys' fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 25, 2009           COUGHLIN STOIA GELLER
                                     RUDMAN & ROBBINS LLP
                                   SAMUEL H. RUDMAN
                                   DAVID A. ROSENFELD


                                   _____
                                        DAVID A. ROSENFELD

                                   58 South Service Road, Suite 200
                                   Melville, NY 11747
                                   Telephone: 631/367-7100
                                   631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

ABRAHAM FRUCHTER & TWERSKY
JACK G. FRUCHTER
One Penn Plaza
Suite 2805
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)

*Attorneys for Plaintiff*

CERTIFICATION OF SAFRON CAPITAL CORPORATION
IN SUPPORT OF CLASS ACTION COMPLAINT

Safron Capital Corporation ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2. Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the proposed Class Period, on July 10, 2008, plaintiff purchased 50 shares of Chesapeake Energy Corporation common stock at a price of $57.25 per share.

5. In the past three years, plaintiff has not served nor sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6. Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24/th

day of February, 2009.

SAFRON CAPITAL CORPORATION