UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

SAFRON CAPITAL CORPORATION,
Individually and On Behalf of All Others
Similarly Situated,

                      Plaintiff,

       vs.

CHESAPEAKE ENERGY CORPORATION,
AUBREY K. MCCLENDON, MARCUS C.
ROWLAND, MICHAEL A. JOHNSON,
RICHARD K. DAVIDSON, FRANK A.
KEATING, BREENE M. KERR, CHARLES
T. MAXWELL, MERRILL A. MILLER, JR.,
DONALD L. NICKLES, FREDERICK B.
WHITTEMORE, UBS INVESTMENT
BANK, ABN AMRO, BANC OF AMERICA
SECURITIES LLC and WELLS FARGO
SECURITIES,

                      Defendants.

———————————————————— x

Civil Action No. 1:09-cv-01826-LTS

CLASS ACTION

AMENDED COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

DEMAND FOR JURY TRIAL

Lead Plaintiff United Food and Commercial Workers Union Local 880 – Retail Food Employers Pension Fund ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations based upon Lead Plaintiff's individual and personal knowledge as to Lead Plaintiff's own acts, and the investigation undertaken by its undersigned counsel as to all other matters, which included, *inter alia*, an analysis of United States Securities and Exchange Commission ("SEC") filings by Chesapeake Energy Corporation ("Chesapeake" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company and interviews with former employees of Chesapeake. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THIS ACTION

1.      This is a securities class action against Chesapeake, its directors and its underwriters (collectively, the "Defendants") for violations of the Securities Act of 1933 (the "Securities Act"). Plaintiff brings this action on behalf of itself and all other purchasers of Chesapeake stock issued pursuant to the registration statement and prospectus (collectively, the "Registration Statement") filed with the SEC and issued by Chesapeake in connection with Chesapeake's July 2008 secondary public stock offering (the "Secondary Offering" or the "Offering").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act.

4.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22 of the Securities Act. Acts and transactions giving rise to the violations of law complained of herein occurred in this District. The violations of law complained of herein occurred in substantial part in this District, including the preparation and dissemination of materially false and misleading statements and the omission of material information complained of herein.  The Underwriter Defendants all maintain their principal places of business in this District.  In connection with the conduct complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone communications, and the facilities of the New York Stock Exchange (the "NYSE").

## PARTIES

5.    Lead Plaintiff United Food and Commercial Workers Union Local 880 – Retail Food Employers Pension Fund purchased Chesapeake common stock in the Secondary Offering, as set forth in its certification previously filed in this case and incorporated by reference herein, and was damaged thereby.

6.    Defendant Chesapeake is the third largest independent producer of natural gas in the United States. It owns interests in approximately 38,500 oil-producing and natural gas wells that are currently producing approximately 2.2 billion cubic feet equivalent, or bcfe, per day, 92% of which is natural gas.  Chesapeake's strategy is focused on discovering, acquiring and developing conventional and unconventional natural gas reserves onshore in the U.S., east of the Rocky Mountains. The Company's principal executive offices are located at 6100 North Western Avenue, Oklahoma City, Oklahoma.  Chesapeake completed its initial public offering in early 1993 and its 600+ million shares trade under the symbol CHK on the NYSE.

7.      Defendant Aubrey K. McClendon ("McClendon") has served as Chairman of the Board, Chief Executive Officer and a director since co-founding the Company in 1989. McClendon signed the Registration Statement.

8.      Defendant Marcus C. Rowland ("Rowland") joined Chesapeake in 1992, prior to the Company's 1993 IPO, and serves as its Executive Vice President of Finance and Chief Financial Officer. Rowland signed the Registration Statement.

9.      Defendant Michael A. Johnson ("Johnson") has served as Chesapeake's Senior Vice President-Accounting, Controller and Chief Accounting Officer since 2000. He previously served as the Company's Vice President of Accounting and Financial Reporting from 1998 to 2000 and as Assistant Controller from 1993 to 1998. Johnson signed the Registration Statement.

10.     Defendant Richard K. Davidson ("Davidson") has been a member of Chesapeake's Board of Directors since March 2006. Davidson signed the Registration Statement.

11.     Defendant Frank A. Keating ("Keating") has been a member of Chesapeake's Board of Directors since 2003. Keating signed the Registration Statement.

12.     Defendant Breene M. Kerr ("Kerr") has been a member of Chesapeake's Board of Directors since 1993. Kerr signed the Registration Statement.

13.     Defendant Charles T. Maxwell ("Maxwell") has been a member of Chesapeake's Board of Directors since 2002. Maxwell signed the Registration Statement.

14.     Defendant Merrill A. Miller, Jr. ("Miller") has been a member of Chesapeake's Board of Directors since 2007. Miller signed the Registration Statement.

15.     Defendant Donald L. Nickles ("Nickles") has been a member of Chesapeake's Board of Directors since 2005. Nickles signed the Registration Statement.

16.     Defendant Frederick B. Whittemore ("Whittemore") has been a member of Chesapeake's Board of Directors since 1993. Whittemore signed the Registration Statement.

17.     The defendants referenced above in ¶¶7-16 are referred to herein as the "Individual Defendants."

18.     Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America. Headquartered in New York City, Banc of America offers trading and brokerage services; debt and securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts, and mergers and acquisitions. Banc of America acted as underwriter for the Secondary Offering, serving as a Joint Book-Running Manager and helping to draft and disseminate the Offering documents.

19.     Defendant UBS Investment Bank ("UBS") is the U.S. operating subsidiary of UBS AG, a diversified global financial services company. Headquartered in New York City, UBS offers wealth management, investment banking, asset management and business banking services. UBS acted as underwriter for the Secondary Offering, serving as a Joint Book-Running Manager and helping to draft and disseminate the Offering documents.

20.     Defendant ABN AMRO ("ABN AMRO") is a bank holding company which performs commercial banking operations, investment banking and other related financial activities through its subsidiaries. Headquartered in the Netherlands, ABN AMRO is managed by a consortium of Fortis, RBS and Santander ("RFS Holdings"). The Dutch state has acquired Fortis' interests in ABN AMRO and continues managing ABN AMRO through RFS Holdings. ABN AMRO acted as an underwriter for the Secondary Offering, serving as a Joint Book-Running Manager and helping to draft and disseminate the Offering documents.

21.    Defendant Wells Fargo Securities ("Wells Fargo") is the investment banking arm of Wells Fargo & Company. Headquartered in San Francisco, Wells Fargo raises public and private debt and equity as well as providing strategic advisory services in the areas of mergers and acquisitions, debt, equity and private capital markets and retail syndications. Wells Fargo acted as the underwriter for the Secondary Offering, serving as a Joint Book-Running Manager and helping to draft and disseminate the Offering documents.

22.    The defendants referenced above in ¶¶18-21 are referred to herein as the "Underwriter Defendants." They served as the underwriters of the Offering and received fees of more than $51 million collectively. The Underwriter Defendants determined that in return for their share of the Offering proceeds, they were willing to merchandise Chesapeake stock in the Offering. The Underwriter Defendants arranged multi-city roadshows prior to the Offering during which they, and certain of the Individual Defendants, including defendants McClendon and Rowland, met with potential investors and presented highly favorable information about the Company.

23.    Representatives of the Underwriter Defendants also assisted Chesapeake and the Individual Defendants in planning the Offering, and purportedly conducted an adequate and reasonable investigation into the business and operations of Chesapeake, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the Offering. During the course of their "due diligence," the Underwriter Defendants had continued access to confidential corporate information concerning Chesapeake's business, financial condition, internal control and its future business plans and prospects, as demonstrated by the $1.1 billion VPP contract UBS AG (along with Deutsche Bank AG) entered into with Chesapeake in January 2008, as described herein and Chesapeake's VPP

- 5 -

contract with ABN AMRO. Lehman Bros., which is now bankrupt, was a co-venturer with Chesapeake in a business that provided 15% of the Company's 2008 revenues.

24.    In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Chesapeake's management and top executives and engaged in "drafting sessions" between May and July 2008. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which Chesapeake stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Chesapeake would be made in the Registration Statement (including the financial statements incorporated therein by reference); and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Chesapeake's management and top executives, the Underwriter Defendants knew, or should have known, of Chesapeake's existing problems as detailed herein.

25.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class. The Underwriter Defendants are liable for the false and misleading statements in the Registration Statement. The Underwriter Defendants drafted and disseminated the Offering documents and were paid fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

26.    Defendant Chesapeake is the third largest independent producer of natural gas in the United States. Chesapeake's strategy is focused on discovering, acquiring and developing

conventional and unconventional natural gas reserves onshore in the U.S., east of the Rocky Mountains.

27.    On or about May 17, 2008, Chesapeake filed with the SEC a Form S-3ASR Registration Statement and Prospectus using a "shelf" registration or continuous offering process. Under the shelf, Chesapeake would be permitted to sell securities described in the Prospectus in one or more offerings, including an indeterminate number of shares of common stock. The Prospectus was a part of the Registration Statement. The securities were to be issued by Chesapeake.

28.    The Form S-3ASR incorporated by reference subsequently filed prospectuses:

[F]or the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

29.    The Form S-3ASR also included assurances that the registrant would:

reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement.

30.    On July 8, 2008, Chesapeake announced it would conduct a common stock offering of 25 million shares. The release also stated that Lehman Bros. and UBS would act as joint book-running managers for the offering.

31.    On July 9, 2008, Chesapeake announced the pricing of its common stock offering in a release which stated in part:

Chesapeake Energy Corporation today announced that it has priced a public offering of 25 million shares of its common stock at $57.25 per share. The company has also granted the underwriters a 30-day option to purchase a maximum of 3.75 million additional shares of its common stock. Chesapeake expects the issuance and delivery of the shares to occur on July 15, 2008, subject to customary closing conditions.

32.    On or about July 9, 2008, the Company filed its Prospectus for the Offering, which was declared effective by the SEC and forms part of the Registration Statement. The Prospectus

incorporated by reference Chesapeake's Form 10-K for the year ending December 31, 2007 and its Form 10-Q for the three months ending March 31, 2008. The Prospectus further incorporated by reference the Company's Form 14A filed on April 29, 2008, certain of the Company's Form 8-Ks filed with the SEC, including the Company's 8-K's filed on January 4, 2008, January 24, 2008, March 20, 2008, March 26, 2008, April 1, 2008, April 16, 2008, April 18, 2008, May 12, 2008, May 23, 2008, May 27, 2008, May 29, 2008, June 4, 2008, June 11, 2008, June 12, 2008, July 8, 2008, and July 9, 2008 (excluding any information furnished pursuant to Item 2.02 or Item 7.01 of any such Current Report on Form 8-K); and Chesapeake's registration statement on Form 8-B (File No. 001-13726) filed on December 12, 1996, as amended by its Current Report on Form 8-K filed on March 26, 2008.

33.    The Registration Statement was negligently prepared and as a result contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations governing its preparation.

34.    **McClendon Stock Holdings**: The Registration Statement failed to disclose the true risk and uncertainties concerning Defendant McClendon's holdings of Chesapeake stock. Chesapeake's Form 14A, dated April 29, 2008, which was incorporated by reference in the Registration Statement, represented that Defendant McClendon beneficially controlled 29,529,975 shares of Chesapeake stock and footnoted that 29,332.493 of those shares were "held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts." This statement was an inaccurate statement of material fact because the Registration Statement failed to disclose that Defendant McClendon lacked the cash necessary to satisfy his margin loans such that if there was a significant decline in the value of his investments, the stock would be seized and sold into the

market, thereby causing a significant decline in the price of Chesapeake stock. Furthermore, the statement that Defendant McClendon had margined his stock did not fully and adequately advise investors of the true risks and uncertainties regarding this action. Indeed, investors did not know that Defendant McClendon lacked the financial resources necessary to satisfy his margin loans such that, if the value of his investments declined, his stock would be seized and sold into the market.

35.    The fact that Defendant McClendon had margined his stock and that the stock was subject to seizure and sale should the value of his investments decline, was a material fact to investors in the Secondary Offering as it would have altered the total mix of information regarding Chesapeake stock. Investors would have found it significant that more than 29 million shares of Chesapeake stock were at risk of being sold and flooding the market if there was a decline in the value of Defendant McClendon's investments because such sales would cause the price of Chesapeake stock to decline.

36.    Between October 3 and 9, 2008, the price of Chesapeake stock declined from $28.55 per share to $16.31 per share on extremely heavy trading volume.

37.    On October 10, 2008, Chesapeake issued a press release announcing that Defendant McClendon had "involuntarily sold substantially all of his shares of Chesapeake common stock over the past three days in order to meet margin loan calls." Defendant McClendon commented on the announcement stating, in pertinent part, as follows:

> I am very disappointed to have been required to sell substantially all of my shares of Chesapeake. These involuntary and unexpected sales were precipitated by the extraordinary circumstances of the worldwide financial crisis. In no way do these sales reflect my view of the company's financial position or my view of Chesapeake's future performance potential. I have been the company's largest individual shareholder for the past three years and frequently purchased additional shares of stock on margin as an expression of my complete confidence in the value of the company's strategy and assets. My confidence in Chesapeake remains undiminished, and I look forward to rebuilding my ownership position in the company in the months and years ahead

38.    **Lehman Bros. Exposure**: The Registration Statement failed to disclose that Lehman Bros. ("Lehman") was the counterparty to a material portion of the contracts hedging Chesapeake's oil and natural gas production. By the time of the Secondary Offering, Lehman was in dire financial condition such that the likelihood that Lehman would be able to pay Chesapeake for the output under the hedging contracts at the agreed-upon prices was greatly reduced. Given this uncertainty, under the rules and regulations governing the preparation of the Registration Statement, the Registration Statement was required to disclose that Lehman was the counterparty for a material amount of the Company's hedging contracts and that should Lehman not be able to perform, the Company could suffer losses of as much as $50 million.

39.    By the time of the Secondary Offering, concerns about Lehman's liquidity and credit-worthiness were growing in the financial community. After the March 2008 collapse of Bear Stearns in the midst of the credit crisis, fears lingered in the market that other investment banks such as Lehman might also be on the verge of insolvency due to heavy losses suffered from investments in risky mortgage-backed securities.

40.    Those fears were confirmed on June 6, 2008, when Lehman shocked the market by reporting a preliminary loss projection for the second quarter of 2008. Shortly thereafter, on June 12, 2008, Lehman announced the resignations of its President and Chief Operating Officer, Joseph Gregory, and its Chief Financial Officer, Erin Callan. By June 13, 2008, Lehman's stock price had fallen 61% since the beginning of the year.

41.    Then, on June 16, 2008, Lehman announced that it would record a net loss for the second quarter of 2008 of $2.8 billion, or $5.14 per share, its first quarterly loss since becoming a publicly-traded company in 1994. Lehman also reported negative revenues for the second quarter of 2008 of $668 million, down from positive revenues of $5.51 billion in the second quarter of 2007.

The losses stemmed from a $4.1 billion write-down of investments, many of which were tied to risky credit investments in subprime mortgage-backed securities. Lehman also announced its plans to offset the loss by raising $6 billion in capital, bringing the total amount of new capital Lehman had raised since the beginning of 2008 to $14 billion, and conceded that additional capital infusions would likely be required.

42.    Under pressure from the Federal Reserve, Lehman subsequently closed a $4.0 billion public offering of common stock and a $2.0 billion public offering of preferred stock, on unfavorable terms that sent its share price plunging further. Lehman also decreased its leverage ratio by unloading $130 billion in assets and reducing its exposure to residential and commercial mortgages.

43.    Following these announcements, investors questioned why Lehman was periodically raising new capital, and why its write-downs were so much greater than in previous quarters, fueling speculation that Lehman was actually more exposed to mortgage-backed assets than it had disclosed, and that its currently-reported book value might not be accurate.

44.    By July 4, 2008, Lehman's stock price was down 65.8% since the beginning of the year, and, as the Economist Intelligence Unit reported, investor concern was mounting that Lehman could face substantial additional losses on non-securitized subprime loans and on other assets affected by the overall economic downturn. Analysts also predicted that Lehman's mortgage assets would deteriorate even further.

45.    By the week of July 6, 2008, Lehman was fending off widely-reported rumors that it was on the verge of collapse, and that its credit losses would force it to be acquired at a significant discount by a larger securities firm, such as the United Kingdom investment bank Barclays.

46.    On July 8, 2008, *Reuters* reported that Platts, a McGraw-Hill Companies pricing clearinghouse, had suspended Lehman from participating in its Singapore oil trading pricing platform due to mounting market concern about Lehman's credit worthiness.

47.    The next day, July 9, 2008, Federal Reserve Chair Ben S. Bernanke, indicated that the U.S. government would not bail out struggling investment banks on the grounds that they were "too big to fail" and instead, U.S. regulators should be empowered to close down failing firms.

48.    As an *Associated Press* article dated July 14, 2008 reported, the announcement likely marked "a shift to a new and potentially more volatile phase of the credit crisis" since "beaten-down investment banks like Lehman Brothers . . . must now fend for themselves as they try to recover from billions of dollars in mortgage-related losses unlike Bear Stearns, whose buyout the government helped orchestrate in March." The *Associated Press* article concluded that the Fed's announcement was "bound to unnerve an already turbulent Wall Street and make investors even more anxious. . . ."

49.    As noted above, Chesapeake filed the Registration Statement on Form S-3, which is a stream-lined registration statement for certain well-capitalized, widely followed issuers. Such issuers are permitted to file scaled down registration statements and incorporate by reference their prior periodic filings – *e.g.*, Forms 10-K and 10-Q. Pursuant to Instruction 11(a) of Form S-3, an issuer utilizing Form S-3 must disclose any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K filed under the Securities Exchange Act of 1934. Accordingly, an issuer utilizing Form S-3 is required to update the information in its periodic filings, including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from

- 12 -

continuing operations," which is required to be disclosed in SEC periodic filings pursuant to Item 303(a) of Regulation S-K. Under Item 303(a), an issuer is required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

50.    Defendants were negligent in not disclosing Chesapeake's hedging exposure to Lehman as, given Lehman's deteriorating financial condition, this represented a "material change" to Chesapeake's operations which was then having, and would have, an unfavorable impact on the Company's revenues and income from continuing operations and, therefore, was required to be disclosed in the Registration Statement. Indeed, the Company's hedging exposure to Lehman would have altered the total mix of information available to investors in the Secondary Offering.

51.    On October 10, 2008, Chesapeake issued a press release announcing "2008 Investor and Analyst Meeting Major Topics" (the "October 10th Press Release"). Among other things, the press release disclosed that the Company had financial exposure to Lehman, which included amounts for unpaid gas sales and amounts due and owing under various derivative contracts. According to the press release, with respect to the terminated derivative contracts, the losses to Chesapeake "will not exceed $50 million."

52.    **Hedge Contracts**: The Registration Statement contained numerous statements concerning Chesapeake's hedging activities and the Company's efforts to protect itself against fluctuations in the price of natural gas. Despite these statements, the Registration Statement did not disclose a key component of the Company's hedging contracts. Specifically, the Registration Statement did not disclose that many of the Company's hedging agreements contained a "kick-out" provision under which the counterparty exposure is "kicked out" if the price of natural gas falls below the specified price. In other words, if the price of natural gas was to fall by a certain amount

- 13 -

in a given month, certain of the Company's hedging agreements could be terminated and the Company would not be protected – hedged – against the decrease in price. Accordingly, the statements in the Registration Statement concerning the Company's hedging activities created a duty to disclose the facts about the "kick-out" provisions.

53.    The fact that a significant portion of Chesapeake's hedging contracts contained "kick-out" provisions was a material fact as investors would have considered it important given the total mix of information about the Company's hedging activities. Indeed, investors would have wanted to know that the Company's hedging protections could be eliminated if the price of natural gas fell by a certain amount.

54.    In the October 10th Press Release, Chesapeake admitted that "a portion of the company's hedging positions contain provisions that limit counter party exposure through 'kicked-out' price levels which would 'terminate a hedge for a particular month when the NYMEX settlement price is below a specified kick out price at contract expiration and result in no financial cash payment by either the counterparty of Chesapeake.'" Further, according to the press release, the Company has "consistently utilized" kick-out provisions for the past "57 months."

55.    Plaintiff and the other members of the Class have suffered hundreds of millions of dollars in damages as a result of their purchases of Chesapeake shares in the Secondary Offering. During late 2008 and early 2009, as the omitted facts were revealed to the market, the price of Chesapeake stock declined to less than $12 per share, which is approximately 80% below the Secondary Offering price.

## CLASS ACTION ALLEGATIONS

56.    Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and (b)(3), on behalf of a class consisting of all persons who purchased Chesapeake common stock in the Offering (the "Class"). Excluded from the Class are the Defendants named herein, the officers and

directors of Chesapeake, members of the immediate families of such officers and directors, and subsidiaries and affiliates of Defendants and their officers and directors. Class members are so numerous that joinder of them is impracticable. Common questions of law and fact predominate and include: (i) whether Defendants violated the Securities Act; (ii) whether the Registration Statement failed to disclose material facts required to be disclosed therein; and (iii) the extent of and appropriate measure of damages.

57.     Plaintiff's claims are typical of all Class members' claims. Plaintiff has selected counsel experienced in class and securities litigation and will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually seek redress for the wrongful conduct alleged.

59.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation, which would preclude its maintenance as a class action.

### COUNT I

**Violation of Section 11 of the Securities Act**
**Against All Defendants**

60.     Plaintiff repeats and realleges each and every allegation contained above.

61.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

62.     This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff does not allege that these Defendants had scienter or fraudulent intent, which are not elements of a Section 11 claim.

- 15 -

63.    The Registration Statement for the Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

64.    Chesapeake is the registrant for the Offering. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

65.    As issuer of the shares, Chesapeake, is strictly liable to Plaintiff and the Class for the misstatements and omissions.

66.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

67.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

68.    Plaintiff acquired Chesapeake shares of common stock pursuant and/or traceable to the Registration Statement for the Offering.

69.    Plaintiff and the Class have sustained damages. The value of Chesapeake shares of common stock has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

70.    Plaintiff repeats and realleges each and every allegation contained above.

71.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

72.    This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff does not allege

that the Defendants named in this Count had scienter or fraudulent intent, which are not elements of

a Section 12 claim.

73.    The Prospectus contained untrue statements of material fact, and concealed and failed

to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the

Class who purchased Chesapeake shares of common stock pursuant to the Prospectus the duty to

make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure

that such statements were true and that there was no omission to state a material fact required to be

stated in order to make the statements contained therein not misleading. Defendants, in the exercise

of reasonable care, should have known of the misstatements and omissions contained in the

Prospectus as set forth above.

74.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known,

of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired the

Company's shares.

75.    By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the

Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members

of the Class who purchased Chesapeake common stock pursuant to the Prospectus sustained

substantial damages in connection with their purchases of Chesapeake common stock. Accordingly,

Plaintiff and the other members of the Class who hold such common stock have the right to rescind

and recover the consideration paid for their shares, and hereby tender their shares to the Defendants

sued herein. Class members who have sold their shares of common stock seek damages to the extent

permitted by law.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants

76.    Plaintiff repeats and realleges each and every allegation contained above.

77.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

78.    The Individual Defendants each were control persons of Chesapeake by virtue of their positions as directors and/or senior officers of Chesapeake. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Chesapeake.

79.    The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding Plaintiff and the members of the Class damages, including interest;

C.    Awarding Plaintiff's reasonable costs and attorneys' fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

- 18 -

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 11, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

ABRAHAM FRUCHTER & TWERSKY
JACK G. FRUCHTER
One Penn Plaza
Suite 2805
New York, NY 10119
Telephone:  212/279-5050
212/279-3655 (fax)

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on September 11, 2009, I caused a true and correct copy of the attached:

Amended Complaint for Violation of the Federal Securities Laws

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel on the attached service list.

Samuel H. Rudman

CHESAPEAKE ENERGY 09
Service List - 6/15/2009   (09-0036)
Page 1 of 1

### Counsel For Defendant(s)

Robert P. Varian
Joseph E. Giometti
Lily I. Becker
Orrick, Herrington & Sutcliffe LLP
The Orrick Building, 405 Howard Street
San Francisco, CA  94105-2669
  415/773-5700
  415/773-5759(Fax)

Barry G. Sher
Hissan Ahsan Bajwa
Daniel B. Goldman
Paul, Hastings, Janofsky & Walker LLP
75 East 55th Street
New York, NY  10022
  212/318-6000
  212/319-4090(Fax)

### Counsel For Plaintiff(s)

Jack G. Fruchter
Abraham, Fruchter & Twersky, LLP
One Pennsylvania Plaza, Suite 2805
New York, NY  10119
  212/279-5050
  212/279-3655(Fax)

Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173(Fax)

Darren J. Robbins
Brian O. O'Mara
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423(Fax)